## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

**AMY FLANIGAN,**
individually and on behalf
of all others similarly situated;

*Plaintiff,*

**v.**                                                                   **Case No. 3:20-cv-1807**

**GENERALI U.S.**
**BRANCH; GENERALI**
**GLOBAL ASSISTANCE, INC.**
**D/B/A CSA TRAVEL PROTECTION**
**AND INSURANCE SERVICES; and**
**CUSTOMIZED SERVICES**
**ADMINISTRATORS, INC.;**

*Defendants.*                                                   **JURY TRIAL DEMANDED**

### PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

COMES NOW Plaintiff Amy Flanigan ("Flanigan" or "Plaintiff"), individually and on

behalf of all other similarly situated persons, against Defendants Generali U.S. Branch; Generali

Global Assistance, Inc. d/b/a CSA Travel Protection and Insurance Services, a/k/a and f/k/a

Customized Services Administrators, Inc. (collectively "Generali" or "Defendants"), and brings

this putative class action. In support thereof, Plaintiff makes the following allegations upon

personal knowledge of the facts pertaining to herself and on information and belief as to all other

matters, and states as follows:

### I. NATURE OF ACTION

This is a class action arising out of Defendants' breach of the terms of travel insurance policies

Defendants issued to Plaintiff. Defendants contracted to indemnify Plaintiff and all others similarly

situated for pecuniary and other losses and damages incurred as a result of covered events that prevented insureds from taking their planned trip. Plaintiff's claims, as well as the claims of each proposed class member, are supported by the written provisions of the Master Policy for travel protection insurance underwritten and administered to them by Defendants. *See* **Exhibit 1**, Policy. The Policy, and all CSA Travel Protection Policies at issue for all other class members nationwide, is identified as "Policy Form series T001."[1]

1. Defendants have caused substantial harm to Plaintiff and the proposed class by improperly refusing to issue reimbursement for trip cancellations explicitly covered by the Policy. Plaintiff has been completely denied reimbursement for her Trip Cancellation Claim ("Claim"). Upon information and belief, Defendants have effectively adopted an approach to categorically issue denials to every Claim arising during the natural disaster that was brought on by COVID-19. Defendants refused to pay COVID-19 related trip cancellations by others insured under the Policy, whether said claimants submitted claims requesting indemnity for: (a) the Maximum Limit(s) Per Person or Plan for Trip Cancellation as listed on their respective Schedules of Benefits; (b) actual damages incurred due to trip cancellations; or (c) the price of the premiums initially paid by the insureds for Policies.

2. Plaintiff brings this action on behalf of herself and all other similarly situated individuals. Plaintiff seeks to recover compensatory damages, as well as declaratory and injunctive relief.

## II. PARTIES

3. Plaintiff Amy Flanigan is a citizen of the United States residing in the city of Holland, in Lucas County, Ohio.

---

[1] *See* **Exhibit 1**, The Policy, at *16.

2

4. Defendant Generali U.S. Branch (or "Generali U.S.") is a Maryland corporation with its principal place of business located in New York, New York. Generali Group is licensed to do business in all 50 states as well as in the District of Columbia; specifically, Generali U.S. is engaged in the business of issuing insurance policies that are underwritten by Generali Group.

5. Defendant Generali Global Assistance, Inc. (or "GGA") is a New York corporation with its principal place of business in Bethesda, Maryland and branches in Alabama, Arizona, Florida, Georgia, Indiana, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nevada, New Mexico, North Dakota, Ohio,[2] Pennsylvania, South Dakota, and West Virginia.

6. GGA also does business under the name Europ Assistance USA, Inc. in Idaho and Michigan.

7. GGA is formerly and alternatively known as Customized Services Administrators, Inc. ("CSA"). CSA registered the trademark "CSA Travel Protection" in 2003.

8. CSA is an active California corporation with its principal place of business in California and branches in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Hawaii, Indiana, Kentucky, Maine, Massachusetts, Minnesota, Missouri, Montana, New Mexico, Nevada, North Carolina, North Dakota, Ohio,[3] Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Virginia, West Virginia, and Wyoming.

9. Five of the above-mentioned CSA branches are alternatively known as Generali Global Assistance and Insurance Services.[4]

10. Because of the unitary nature of Generali's businesses, all above-listed Defendant entities; Generali Group, Generali U.S., GGA, and CSA, shall hereinafter be referred to and treated

---

[2] Ohio SOS Business Entity No. 2096052.
[3] Ohio SOS Business Entity No. 2093089.
[4] Arkansas, Hawaii, Indiana, Maine, and Utah.

collectively as "Generali" or "Defendants" unless addressed separately.

11. Currently and at all times relevant herein, Generali, through its practices and relationships with its subsidiaries and alternate business names under which it carries out a vast majority of its U.S. business, has consistently shown an existing unity of ownership, of operation, and of use sufficient to definitively establish the unitary nature of Generali's business. Specifically, in addition to the clear unity of ownership as set forth above, Generali's operational unity is evidenced by central advertising, accounting, and management in the United States; further, Generali has demonstrated unity of use in its general system of operation.

12. For the foregoing reasons, all Defendant Generali entities can be said to maintain the same registered agent in Ohio, Corporation Service Company, who can be served at 50 West Broad Street Suite 1330, Columbus, Ohio 43215.

### III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant; there are more than 100 members of the Class; and upon information and belief the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

14. This Court has general personal jurisdiction over Defendants because Generali, by and through its U.S. entities, has purposefully availed itself of the benefits and protections of Ohio by conducting continuous and systematic business operations that are so substantial in this judicial district so as to render it essentially at home in this state. Defendant Generali U.S. underwrites insurance policies to residents of this district and, as stated above,[5] Defendants GGA and CSA

---

[5] *Supra* notes 2-3.

both maintain branches in this district actively registered with the Ohio Secretary of State.[6]

15. This Court has specific jurisdiction over Defendants because they marketed and sold the insurance policy at issue in this case to the Plaintiff in Ohio; they directed the claim denial to Plaintiff in Ohio; and they collected insurance premiums from Plaintiff in Ohio.

16. Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. § 1391 in that all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Northern District of Ohio.

### IV. FACTUAL BACKGROUND

17. On February 6, 2020, Plaintiff used the online vacation booking website VRBO.com to book accommodations for her 40th birthday celebration weekend in Galveston, Texas. She invited five friends and arranged plans for the six of them (the "group") to stay at the "Sandy Secret" beach house in Galveston on the weekend of May 7-10, 2020.

18. Plaintiff paid for the group's oceanfront vacation rental accommodations through VRBO. The total cost came out to $4,434.50.[7]

19. Upon checkout on VRBO's booking site, Plaintiff elected to pay an optional, additional fee of $200.61 for a travel insurance coverage plan ("CSA Travel Protection" or "Plan") underwritten by Generali. *See* **Exhibit 2,** Policy Confirmation Email (2.7.2020) and **Exhibit 3**, Payment Breakdown Email (2.14.2020).

20. In February, Plaintiff also booked roundtrip plane tickets with Delta Air Lines, for herself and five friends (the "group").

21. Plaintiff scheduled the May 7 flights to depart from Detroit Metropolitan Airport (DTW), an

---

[6] Generali Global Assistance, Inc. ("GGA") Ohio Dept. of Insurance No. 958064, NPN No. 16530910; Customized Services Administrators, Inc. ("CSA") Ohio Dept. of Insurance No. 1024960, NPN No. 660418.

[7] This figure included: 1) $800 per night for three nights; 2) a $400 deposit for a cleaning fee; 3) a $172.50 "administrative fee;" 4) a $294 "service fee;" 5) $168 in taxes; and 6) a $1,000 refundable damage deposit.

approximately 30-minute drive from Plaintiff's residence in suburban Toledo. Plaintiff and her friends were scheduled to land at George Bush Intercontinental Airport in Houston, Texas (IAH) and make the 1-hour drive to Galveston for their three-night stay in the beach house accommodations before flying out of IAH on Sunday, May 10, to land back at DTW.

### The COVID-19 Pandemic

22. On January 21, 2020, the first case of Coronavirus ("COVID-19") was diagnosed in the United States.

23. On January 30, the World Health Organization declared COVID-19 a "Global Health Emergency;" a "Public Health Emergency of International Concern," on the next day, January 31, the President declared COVID-19 a public health emergency.

24. On February 11, the coronavirus was given its official name, COVID-19, by the World Health Organization.

25. On February 29, the day the first United States COVID-19 death was reported,[8] the U.S. government issued a "do not travel" warning and prohibited international travel between the United States and several countries with COVID-19 outbreaks.

26. On March 9, Ohio was put under a state of emergency after three people tested positive for COVID-19.[9] Ohio's case count was much lower than case counts in other states; for example, by March 7, two days before Ohio confirmed its first three cases, New York had eighty-nine confirmed cases.[10]

27. On March 13, Dr. Mike Ryan, the head of the World Health Organization's health

---

[8] https://www.nytimes.com/article/coronavirus-timeline.html (last visited Aug. 13, 2020).
[9] https://abc6onyourside.com/news/local/timeline-of-coronavirus-in-ohio (last visited Aug. 13, 2020).
[10] Emma Newburger, *New York declares state of emergency over coronavirus outbreak* (Mar. 7, 2020), https://www.cnbc.com/2020/03/07/new-york-governor-andrew-cuomo-declares-state-of-emergency-over-coronavirus-outbreak.html (last visited Aug. 13, 2020).

emergencies program, said the virus may become "just another endemic virus in our communities, and this virus may never go away."[11] However, also on March 13, four days after Ohio declared emergency, Texas declared a state of disaster[12] and the President declared a "National Emergency."

28. Despite such declarations, on March 16, Ohio's case count had only risen to thirty-seven and Texas's count was only at seventy-seven, while states such as Washington and New York had case counts of 769 and 746, respectively.[13] In light of statistics and available news updates, Plaintiff held off on cancelling her trip, which was still approximately 2 months away at the time, and awaited further news before deciding to cancel her trip.

29. On March 25, Plaintiff sent a message to the destination beach house owners: "I am keeping watch to see if this trip is going to be able to happen. Still have about another week in [sic] a half to see if we can travel…"

30. On March 26, Michigan Governor Gretchen Whitmer requested a major disaster declaration. The President granted Whitmer's request for a major disaster declaration on March 28.

31. Also on March 26, Texas Governor Greg Abbott issued Executive Order GA-11, "[r]elating to airport screening and self-quarantine during the COVID-19 disaster."[14] The executive order provided, in part, that "on a statewide basis effective at noon on March 28, 2020":

> Every person who enters the State of Texas as the final destination through an airport, from a point of origin or point of last departure in New York, New Jersey, Connecticut, or the City of New Orleans, or in any other state or city as may be proclaimed hereafter, shall be subject to mandatory self-quarantine for a period of 14 days from the time of entry into Texas or the duration of the person's presence in Texas, whichever is shorter.

---

[11] *Supra* note 9.

[12] https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19 (last visited Aug. 12, 2020).

[13] Trevor Nace, *Here Are The States With The Most (And Least) Coronavirus Cases* (Mar. 16, 2020, 12:33 PM), https://www.forbes.com/sites/trevornace/2020/03/16/here-are-the-states-with-the-most-and-least-coronavirus-cases/#18073b1d6af4 (last visited Aug. 13, 2020).

[14] https://gov.texas.gov/uploads/files/press/EO-GA-11_airport_travel_reporting_COVID-19_IMAGE_03-26-2020.pdf (last visited Aug.13, 2020).

32. Governor Abbott's Order GA-11 recognized the danger posed by "community spread of COVID-19" as one of the rationales for imposing the mandatory quarantine of travelers from outside the state.

33. On March 27, U.S. Surgeon General Jerome Adams dubbed Metro Detroit, which has a large majority of the cases, a "hot spot."[15]

34. On March 29, Texas Governor Abbott issued an additional order, Executive Order GA-20, effective at noon on March 30, 2020, to add visitors from several locations to his Executive Order GA-11, including those from the states of California, Louisiana, and Washington and the cities of Atlanta, Chicago, Miami and, most notably for Plaintiff's purpose, Detroit.[16]

35. Because Plaintiff was scheduled to fly out of Detroit, Plaintiff had no other choice but to cancel her trip once Texas's restrictions regarding air travelers coming in from hot spots – including Detroit, Plaintiff's airport of origin –  would impose a forced self-quarantine on her and her travel companions.

36. In fact, it was not until May 21, 2020 – *after* Plaintiff's planned trip for the weekend of May 7-10 – that Governor Abbott lifted the quarantine imposed by Executive Order GA-20.[17]

**<u>Plaintiff's Trip Cancellation</u>**

37. When Plaintiff purchased the CSA Policy at the same time she booked the trip accommodations through VRBO on February 6, neither she nor any reasonable person in her situation could have foreseen the outbreak of a worldwide viral pandemic that would unfold at a rapid rate over the following months. The only significant information known by, or available

---

[15] https://www.mlive.com/public-interest/2020/803/coronavirus-hot-spot-in-detroit-expected-to-grow-with-increased-testing-mayor-says.html (last visited Aug 13, 2020).

[16] https://gov.texas.gov/uploads/files/press/DISASTER_COVID19_disaster_air_travel_restric_adds_IMAGE_03-29-2020.pdf (last visited Aug. 13, 2020).

[17] https://gov.texas.gov/uploads/files/press/EO-GA-20_expanding_travel_without_restrictions_COVID-19.pdf (last visited August 13, 2020).

to, Plaintiff or any other U.S. citizens was that the sudden public health emergency was labeled as "global" and of "international concern."[18]

38. Indeed, when Plaintiff booked her trip on February 6, 2020, no declarations of disaster or emergency had been made by any U.S. state and the World Health Organization had not yet assigned a name to the novel coronavirus (now "COVID-19"). Plaintiff's February 6 beach house booking date was also weeks before the first COVID-19 death was reported in the US on February 29, when Washington became the first state to declare emergency.[19]

39. Similarly, Plaintiff's March 3 flight booking was made before she could reasonably foresee that she would have to later cancel the trip. It was not until on March 9 that Ohio declared emergency, and not until March 13 that Texas declared the same. It was not until March 29 that Texas Governor Abbott implemented the mandatory quarantine for travelers from Detroit, which went into effect March 30.

40. Plaintiff notified the Galveston, Texas beach house owners on April 8 that she needed to cancel her trip.

41. They refunded Plaintiff the $400 cleaning and $1,000 damage deposits Plaintiff had paid.

---

[18] To present-day U.S. citizens, a global health emergency (or, alternatively, a public health emergency of international concern ("PHEIC") may be a graspable concept in theory, but in actuality would not be appropriately considered a relatable or fully comprehensible familiarity. Prior to the 2020 outbreak of the novel coronavirus in the United States swept disease across the nation in a way that directly affected U.S. citizens like never before, as only five global health emergencies had ever been declared by the World Health Organization. Further, most of those previous PHEIC declarations had been of little concern to the United States specifically. For example, the 2014 Ebola outbreak centered in West Africa, and the Zika virus outbreak centered primarily in Brazil, which reported approximately 1.3 million estimated cases. Even as recently as less than one year ago in 2019, the World Health Organization declared the 2018-19 Ebola outbreak as a PHEIC, yet still it was hardly a topic of conversation in the U.S. because it centered in the Democratic Republic of Congo. *See https://time.com/5774747/coronavirus-who-public-health-emergency/* (last visited Aug 13, 2020).

[19] Rosie Perper, Ellen Cranley, and Sarah Al-Arshani, *Almost all US states have declared states of emergency to fight coronavirus — here's what it means for them* (Mar. 17, 2020, 12:34 AM), https://www.businessinsider.com/california-washington-state-of-emergency-coronavirus-what-it-means-2020-3?op=1 (last visited Aug. 13, 2020). *See also* https://www.governor.wa.gov/news-media/inslee-issues-covid-19-emergency-proclamation (Feb. 29, 2020) (detailing Washington Governor Jay Inslee's declaration of emergency).

42. Plaintiff messaged the owners on May 8: "Good afternoon, can you tell me the total amount you will be refunding me so I can submit paperwork to my travel insurance?" The owners said they had already refunded Plaintiff through VRBO for the $1,400 in cleaning and damage deposits. Plaintiff responded: "Thank u- I will wait a few more weeks before I submit to insurance. I want to make sure I have all the right numbers…"

### Defendants' Denial of Plaintiff's Claims as an Insured Policyholder

43. On July 17, Plaintiff submitted a Trip Cancellation claim via Defendants' online "eClaims portal" at https://homeaway-travel-us.eclaims.csaclaims.com/.

44. On July 24, Plaintiff received a denial letter by email, which stated that the reason for denial was because "the cause of [Plaintiff's] loss is not due to an event that is covered by the plan [she] purchased." *See* **Exhibit 4**, CSA Denial Email (7.24.2020).

45. On July 27, Plaintiff messaged the beach house owners to inform them that her travel insurance denied her coverage for her cancelled trip. She said, "I was reviewing the VRBO covid policy and it suggested I ask tor a credit from you. Please let me know if we can do this and what you need from me…" The owners responded by citing to their no-refunds policy mentioned in their VRBO description and rental agreement.

46. Defendants have denied Plaintiff's Claim, refusing to cover her losses due to her trip cancellation despite the fact that that the cause of her cancellation is a "covered event" under Defendants' Policy.

47. The Policy provides coverage for Trip Cancellation, among other travel plan protections.

48. The Trip Cancellation Benefit Rider states:

Benefits will be paid, up to the amount in the Schedule, for the forfeited, prepaid, non-refundable, non-refunded and unused published Payments that you paid for your Trip, <u>if you are prevented from taking your Trip due to one of the following unforeseeable Covered Events</u>

that occur before departure on your Trip to you or your Traveling Companion, while your coverage is in effect under this Policy.

### **"Covered Events" Under the Policy**

#### *Inaccessible Accommodation Coverage*

49. The Policy lists the following item (hereinafter "Inaccessible Accommodations Coverage")

under "Covered Events:"

Your Accommodations at your destination made inaccessible due to fire, flood, volcano, earthquake, hurricane or other natural disaster. We will only pay benefits for losses occurring within 15 calendar days after the event renders the destination inaccessible. For the purpose of this coverage, inaccessible means your Accommodations can not be reached by your original mode of transportation. Benefits are not payable if the event occur or if a hurricane is named prior to or on your Trip Cancellation Coverage Effective Date.[20]

50. Due to the COVID-19 pandemic, the President officially approved declarations of disaster for Ohio, Texas, and Michigan, Plaintiff's domicile, trip destination, and trip departure location. The President also, in declaring the pandemic a "national emergency," invoked the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5121 *et seq.*, which is the statutory authority for most federal disaster response activities. The President's Disaster Relief Fund, managed by FEMA, is used to fund various "disaster assistance programs."

51. The declarations of disaster throughout the country and, specifically as to Plaintiff's case, in Ohio, Texas and Michigan, had already been officiated as of the date of Plaintiff's Trip Cancellation.

#### *Quarantine Coverage*

52. Further, the Policy's "Covered Events" specifically provide for coverage in the event of "Being hijacked or Quarantined," and "Quarantine" *is* a Defined Term set forth in the  Policy and

---

[20] Policy, p. 17.

stated specifically as follows: "QUARANTINE means the enforced isolation of your or your

Traveling Companion, for the purpose of preventing the spread of illness, disease or pests."

**<u>Generali's Blanket Denial of All Claims Filed as a Result of COVID-19 Effects</u>**

53. Generali, in "A Message to [their] Customers About Coronavirus," stated:

> <u>As of January 29, 2020, the Coronavirus (COVID-19) outbreak was considered a foreseeable event</u>. Consequently, any event(s) related to COVID-19 for all new travel policies purchased on or after January 29, 2020[21] may thereby be excluded in accordance with the terms and conditions of the Policy.  <u>In addition, there will be no coverage for COVID-19 related losses occurring on or after March 11, 2020</u>, the date COVID-19 was formally declared a pandemic by the World Health Organization. Please note, our plans will not cover fear of travel. Customers are strongly encouraged to read their Description of Coverage or Insurance Policy (https://www.qeneralitravelinsurance.com/retrieve-policy.html) for details regarding their available coverage.

*See* **Exhibit 5,** Generali COVID-19 Notice.

54. Despite unambiguous language in the policy, which is a fully integrated insurance agreement,

Defendants breached the policy by failing to indemnify Plaintiff for the losses she incurred as

a result of the forced cancellation of her travel plans due to a covered event.

**V. CLASS ALLEGATIONS**

55. Plaintiff brings this action, individually, and on behalf of a nationwide class, pursuant to

Federal Rule of Civil Procedure Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2),

23(b)(3) and/or 23(c)(4), defined as follows :

**Nationwide Class**
All persons located within the United States that purchased Generali insurance plans accompanied by the Policy and were prevented from taking a trip as a result of a covered event during the COVID-19 pandemic who have incurred out of pocket Trip Cancellation expenses.

56. In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure,

Rule 23(c)(5), Plaintiff seeks to represent the following state class only in the event that the

Court declines to certify the Nationwide Class above. Specifically, a "State Class" consisting

of the following:

**Ohio Class**
All persons in Ohio that purchased Generali insurance plans accompanied by the Policy and
were prevented from taking a trip as a result of a covered event during the COVID-19 pandemic
who have incurred out of pocket Trip Cancellation expenses.

57. Excluded from the class(es) are Defendants, any entities in which Defendants have a

controlling  interest, any of the officers, directors, or employees of the Defendants, the legal

representatives, heirs, successors, and assigns of the Defendants, anyone employed with

Plaintiff's counsels' firms, any Judge to whom this case is assigned, and his or her immediate

family.

58. In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure,

Rule 23(c)(5), Plaintiff seeks to represent the following state class only in the event that the

Court declines to certify the Nationwide Class above. Specifically, a "Travelers to Texas

Class" consisting of the following:

**Travelers to Texas Class:**

All persons located within the United States
- who purchased Generali insurance plans accompanied by the Policy,
- whose point of origin or point of last departure was New York, New Jersey, Connecticut, California, Louisiana, Washington, or the cities of New Orleans, Atlanta, Chicago, Detroit, or Miami, and

  o for those whose point of origin or point of last departure was New York, New Jersey, Connecticut, or New Orleans, who were prevented from traveling to Texas between March 28, 2020 and May 21, 2020 (inclusive); or

  o for those whose point of origin or point of last departure was California, elsewhere in Louisiana (not New Orleans), Washington state, Atlanta, Chicago, Detroit, or Miami, who were prevented from traveling to Texas between March 30, 2020 and May 21, 2020 (inclusive); and

- who have incurred out of pocket Trip Cancellation expenses.

59. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Due to the nature of the insurance involved, the members of the Class are geographically dispersed throughout the United States. While the exact number of Class members is information not readily available at this time, as only Generali possesses the data to determine a numerical figure to indicate the Policies sold throughout the US that have resulted in myriad claims Generali has received from consumers who would qualify as Class Members for purposes of this action, Plaintiff has reasonable belief that there are thousands of potential members in the Class. Generali states on its website that it has a presence in 50 countries in the world and earned a total premium income in excess of €69.7 billion (approximately $80 billion) in 2019, serving 61 million customers worldwide.[22]

60. **Typicality.** Plaintiffs' claims are typical of the claims of the other members of the Class she seeks to represent because Plaintiff and all Class members purchased identical coverage from Generali containing identical language regarding Trip Cancellation and Covered Events, and all Class members have been improperly denied coverage.

61. **Adequacy.** Plaintiff has retained counsel experienced in complex class action and insurance litigation. Plaintiff has no interests which are adverse to or in conflict with other members of the Class. Plaintiff will fully and adequately protect the interests of all members of the Class.

62. **Commonality.** The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, namely: whether the events caused by the emergence of the COVID-19 pandemic constitute Covered Events under the Policy; whether the effects of any disaster or emergency declarations, stay-at-home directives, "stop the spread" initiatives, or any other national health or safety warnings issued

---

[22] https://www.generali.com

as a result of the COVID-19 pandemic that precluded Class Members from embarking upon or completing trips for which they purchased Policy coverage, trigger Covered Events under the Policy's terms; and whether the Policy requires Generali to reimburse Policy holders for expenses incurred as a result of trip cancellation due to events caused by the COVID-19 pandemic national disaster.

63. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

64. The interest of the members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class is cohesive, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the Class are uniform and generally formulaic, and the expense and burden of individual litigation could preclude them form fair redressal of the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## COUNT I: BREACH OF CONTRACT

**(individually and on behalf of the Nationwide Class or, in the alternative, the State Class or the Travelers to Texas Class)**

65. The preceding paragraphs are incorporated by reference as if fully alleged herein.

66. Plaintiff and the class purchased insurance from Defendants and were thereupon issued the Policy.

67. The Policy is a valid and enforceable contract between Generali and all policyholders, including Plaintiff and class members.

68. Plaintiff and the class members substantially performed their obligations under the terms of the Policy and Class Policies.

69. Plaintiff and the class members suffered losses from events that should be reimbursed as results of Covered Events under the Policy.

70. Defendants have failed to compensated Plaintiff and class members for their respective losses as required by the Policy.

71. As a direct and proximate result of Defendant's breaches, Plaintiff and the class have sustained damages that are continuing in nature in an amount to be determined at trial.

## COUNT II: BAD FAITH (individually and on behalf of the Nationwide Class or, in the alternative, the State Class, or the Travelers to Texas Class )

72. The preceding paragraphs are incorporated by reference as if fully alleged herein.

73. Defendants owed Plaintiff a duty of good faith in all aspects regarding her insurance policy, including to investigate in good faith and provide a reasonable justification for denial.

74. An insurer lacks reasonable justification when it denies the claim in an arbitrary or capricious manner.

75. Defendants' blanket policy for denying all COVID-19 related claims after a date certain constitutes arbitrary and capricious claims handling and adjusting. Such conduct was uniform as to all class members, and constitutes bad faith.

76. As a direct and proximate result of Defendant's breaches, Plaintiff and the class have sustained damages that are continuing in nature in an amount to be determined at trial, including punitive damages and attorneys' fees.

### COUNT III: DECLARATORY AND INJUNCTIVE RELIEF

**(individually and on behalf of the Nationwide Class or, in the alternative, the State Class, or the Travelers to Texas Class)**

77. The preceding paragraphs are incorporated by reference as if fully alleged herein.

78. An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other, concerning the respective rights and duties of the parties under the Policy.

79. Plaintiff contends that Generali has breached the Policy by failing to timely pay Class Members for their respective losses for covered damages.

80. Plaintiff, therefore, seeks a declaration of the parties' respective rights and duties under the Policy  and requests the Court to declare Generali's conduct unlawful and in material breach of the Policy so as to avoid future controversies that would allow for continual injustices such as the one at issue here, where huge insurance companies take advantage of masses of consumers.

81. Pursuant to a declaration of the parties' respective rights and duties under the Policy and Class Policies, Plaintiff further seeks an injunction enjoining Defendant (1) from continuing to engage in conduct in breach of the Policy; and (2) ordering Defendant to comply with the terms of the Policy, including payment of all amounts due to each respective class member under the stated Policy coverages that were extended to them upon purchase.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

(a)  That the Court enter an order certifying the class, appointing Plaintiff as a representative of the class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

(b) For a judgment against Defendant for the causes of action alleged against it;

(c) For compensatory damages in an amount to be proven at trial;

(d) For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy and Class Policies;

(e) For appropriate injunctive relief, enjoining Defendant from continuing to engage in conduct related to the breach of the Policies;

(f) For pre-judgment and post-judgment interest at the maximum rate permitted by law;

(g) For Plaintiff's attorneys' fees;

(h) For Plaintiff's costs incurred; and

(i)  For such other relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

August 13, 2020

Respectfully submitted,

*s/Jeffrey L. Raizner*
Jeffrey L. Raizner, Attorney-in-Charge
Texas Bar No. 00784806 (admitted in NDOH)

18

jraizner@raiznerlaw.com
**RAIZNER SLANIA LLP**
2402 Dunlavy Street
Houston, Texas 77006
Telephone: (713) 554-9099
Facsimile: (713) 554-9098

*Of Counsel*:

Ben Wickert
Texas Bar No. 24066290
(*pro hac vice* forthcoming)
bwickert@raiznerlaw.com
**RAIZNER SLANIA LLP**
2402 Dunlavy Street
Houston, Texas 77006
Telephone: (713) 554-9099
Facsimile: (713) 554-9098
**ATTORNEYS FOR PLAINTIFF**